11-696-cv
SEC v. Apuzzo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2011

(Argued: March 14, 2012                 Decided:    August 8, 2012)

Docket No. 11-696-cv

————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellant*,

—v.—                                   11-696-cv

JOSEPH F. APUZZO,

*Defendant-Appellee*

————————

Before :

WINTER, RAGGI, *Circuit Judges*, and RAKOFF, *District Judge**

————————

Appeal from the judgment of the United States District Court for the District of Connecticut (Thompson, J.) granting the motion of Defendant-Appellee Joseph Apuzzo to dismiss the Complaint. The Securities and Exchange Commission alleges that Apuzzo aided and abetted securities laws violations through his role in a fraudulent accounting scheme. The district court granted Apuzzo's motion to dismiss on the ground that the Complaint did not meet the "substantial assistance" component of aiding and abetting liability because it failed to adequately allege that Apuzzo proximately caused the harm on which the primary violation was predicated.

---

*The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

We hold that, in SEC civil enforcement actions, the test for substantial assistance is that the aider and abettor "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). Applying that test, we hold that the Complaint plausibly alleged that Apuzzo aided and abetted the primary violation. **REVERSED and REMANDED**.

_____

JOHN W. AVERY, Senior Litigation Counsel (Mark D. Cahn, General Counsel, Anne K. Small, Deputy General Counsel, Jacob H. Stillman, Solicitor, *on the brief*), United States Securities and Exchange Commission, *for Plaintiff-Appellant.*

SETH TAUBE (Aaron M. Street, Mauren P. Reid, *on the brief*) Baker Botts LLP, *for Defendant-Appellee.*

_____

RAKOFF, *District Judge*:

The Securities and Exchange Commission ("SEC") alleges that defendant Joseph Apuzzo aided and abetted securities laws violations through his role in a fraudulent accounting scheme. In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985)). After Apuzzo moved to dismiss the Complaint, the district court, Thompson, J., granted Apuzzo's motion to dismiss. Although the district court found that the Complaint plausibly alleged that Apuzzo had actual knowledge of the primary violation, it concluded that the Complaint did not adequately allege "substantial assistance." Specifically, the district court held that the "substantial assistance"

2

component required that the aider and abettor proximately cause the harm on which the primary violation was predicated, and that the Complaint did not plausibly allege such proximate causation.

For the reasons set forth below, we hold that to satisfy the "substantial assistance" component of aiding and abetting, the SEC must show that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). Applying that test, we hold that the Complaint plausibly alleged that Apuzzo aided and abetted the primary violation, and we therefore reverse the district court.

**FACTUAL ALLEGATIONS**

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6). *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). We accept as true all well-pleaded factual allegations in the Complaint and we draw all reasonable inferences in favor of the plaintiff. *Id.* To survive a motion to dismiss, "a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The following facts are drawn from the allegations in the Complaint, together with those "documents . . . incorporated in it by reference" and "matters of which judicial notice may be

3

taken." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (internal quotation marks omitted).

The Terex Corporation ("Terex") manufactures equipment primarily for use in the construction, infrastructure, and surface to mining industries. Apuzzo was the Chief Financial Officer of Terex from October 1998 to September 2002. United Rentals, Inc. ("URI") is one of the largest equipment rental companies in the world. Michael J. Nolan was URI's Chief Financial Officer from its inception in September 1997 until December 2002.

In late December 2000, and again in late December 2001, URI and Nolan, with Apuzzo's assistance, carried out two fraudulent "sale-leaseback" transactions. These transactions were designed to allow URI to "recognize revenue prematurely and to inflate the profit generated from URI's sales." Compl. ¶ 11.

Briefly stated, the scheme worked as follows: URI sold used equipment to General Electric Credit Corporation ("GECC"), a financing corporation, and leased the equipment back for a short period. In order to obtain GECC's participation in these transactions, URI convinced Terex to agree with GECC to resell the equipment for GECC at the end of the lease periods. Terex and URI also agreed that Terex would provide a residual value guarantee (the "Residual Value Guarantee") to GECC. That guarantee provided that after resale, GECC would receive no less than 96% of the purchase price that GECC had paid URI for the used equipment. However, to secure Terex's participation in the transactions, URI secretly agreed to indemnify Terex for any losses Terex incurred from the Residual Value Guarantee. URI also agreed to make substantial purchases of new equipment from Terex to improve Terex's year-end sales.

4

Under Generally Accepted Accounting Principles ("GAAP"), URI could immediately recognize the revenue generated by the sale of equipment to GECC if several criteria were met. These criteria included 1) that the "risks and rewards of ownership" had been fully transferred to GECC and 2) that the sale price was "fixed and determinable," or, in other words, that there were no unsettled commitments related to the sale. Compl. ¶ 13. Because URI had secretly agreed to indemnify Terex for any losses that Terex would incur, URI had not fully transferred the risks and rewards of ownership and there were unsettled commitments associated with the sale. Therefore, URI was prohibited under GAAP from recording revenue from the sales, and Apuzzo knew that if the full extent of the three party transactions was transparent, URI would not be able to claim the increased revenue. Apuzzo therefore executed various agreements that disguised URI's continuing risks and financial obligations, and he also approved inflated invoices from Terex that were designed to conceal URI's indemnification payments to Terex.[1]

The Complaint also elaborates the scheme in more detail:

The Terex I Transaction. In late 2000, URI was looking for a way to meet its announced earnings expectations for fiscal year 2000. URI, through its CFO Nolan, decided to set up a sale-leaseback transaction (the "Terex I" Transaction) that would allow URI to record an immediate revenue from the sale of used equipment in its year-end financial statements.

On December 29, 2000, URI and GECC entered into a contract for GECC to buy a fleet of used equipment (the "Equipment") from URI for $25.3 million; GECC would then lease that

---

[1] The Complaint alleges that Apuzzo approved inflated invoices relevant to the first transaction described below. With respect to the second transaction, also described below, the Complaint alleges that Apuzzo knew about the inflated invoices, and that he was in charge of the transaction, but it does not specifically allege that he approved those invoices.

5

equipment back to URI for eight months.  Before GECC would participate in this deal, it required a third party to agree to resell the Equipment at the end of the lease period and to guarantee GECC a high residual value for the Equipment.[2]  Nolan discussed the proposed transaction with Apuzzo, and Apuzzo agreed that Terex would participate as the third-party on two conditions:  (1) URI would  indemnify Terex for all losses that Terex incurred from any residual value guarantee, and (2) URI would make additional new equipment purchases from Terex in the 2000 calendar year in order to improve Terex's year-end financial results.

After Terex and URI agreed to Terex's role in the transaction, URI and GECC signed a contract to sell and leaseback the Equipment, and GECC and Terex simultaneously entered into a remarketing agreement (the "Terex I Remarketing Agreement").  Pursuant to the Terex I Remarketing Agreement, which Apuzzo signed on behalf of Terex, Terex agreed to resell the Equipment at the end of the eight month lease period.  Terex also gave GECC a residual value guarantee (the "Residual Value Guarantee") that the Equipment would be resold for at least 96% of the price that GECC had paid, and that if it was not, Terex would refund any shortfall between the actual resale price and the Residual Value Guarantee price. Terex also agreed that it would purchase at the Residual Value Guarantee price any Equipment that remained unsold at the end of the remarketing period.

To consummate the URI-Terex portion of the transaction, Apuzzo and Nolan agreed that URI would purchase $20 million of new equipment from Terex before the end of the 2000 calendar year.  URI also agreed to pay Terex $5 million immediately to cover the anticipated losses that Terex would suffer from the Residual Value Guarantee.  URI and Terex executed a

---

[2] GECC also required that URI pay it a fee to participate in the transaction.

"backup" remarketing agreement (the "Terex I Backup Remarketing Agreement"), which Apuzzo negotiated and signed on behalf of Terex. Under this agreement, URI agreed to indemnify Terex for any losses that it suffered from the Residual Value Guarantee that exceeded the $5 million advance payment. Apuzzo and Nolan further agreed that URI's indemnification payments to Terex would be made as undisclosed "premiums" that would be paid on URI's purchase of new equipment from Terex. Compl. ¶ 28. Apuzzo knew that if URI's indemnification payments were disclosed, URI's auditors would object to URI recognizing any revenue from the sale-leaseback transaction in its year-end financial statements.

Apuzzo therefore signed a version of the Terex I Backup Remarketing Agreement that did not reference GECC and did not mention that the equipment that Terex was reselling was the same equipment that URI had sold to GECC. The Terex I Backup Remarketing Agreement also did not mention URI's agreement to take over Terex's remarketing obligations and to indemnify Terex for any losses. Although Apuzzo had inserted references to these side-arrangements in the initial draft of the agreement, after Nolan and others at URI deleted those references, Apuzzo knowingly signed the disguised agreement.

The initial $5 million indemnification payment from URI to Terex was made in conjunction with URI's purchase of $20 million of new equipment from Terex. On December 29, 2000, Apuzzo approved two Terex invoices that listed the value of the equipment as $25 million rather than $20 million. Nolan forwarded the inflated invoices to URI's accounting department, "knowing that the accounting department would enter the incorrect prices in URI's books and records"; in so doing, Nolan hoped to conceal the $5 million indemnification payment from URI to Terex. Compl. ¶¶ 29-30.

Before agreeing to the Residual Value Guarantee, Apuzzo received an internal appraisal of the Equipment that URI was selling to GECC. Based on that appraisal, Apuzzo knew that URI sold the Equipment to GECC at a price above fair market value. Apuzzo also knew that Terex's agreement to guarantee GECC at least 96% of the inflated price that GECC paid to URI (i.e., the Residual Value Guarantee) would likely cause Terex to suffer "substantial losses" when the Equipment was resold. Compl. ¶¶ 24-25. Later, Apuzzo was asked to provide URI's auditor with a valuation letter stating that URI had assigned fair market value to the equipment. In response to this request, Apuzzo did not reveal the results of Terex's appraisal that had concluded that URI had overstated the value of the equipment. Instead, he offered to provide a letter to URI's auditor that stated that "nothing has come to [his] attention" to cause him to believe that URI's valuations were incorrect. Compl. ¶ 26 (alteration in original). (Although Apuzzo offered to provide this letter, however, he did not in fact ever provide it.)

On December 31, 2002, once it was clear how much money Terex owed GECC for the Terex I transaction, and therefore how much money URI owed to Terex, Apuzzo signed another contract between URI and Terex. Under this contract, URI agreed to make an $8 million "prepayment" on the purchase of additional equipment from Terex in the first six months of 2003. Compl. ¶ 32. Terex would keep this prepayment even if URI did not make any additional equipment purchases. Apuzzo knew that the contract he signed with URI was intended to disguise the real purpose of the prepayment, which was to indemnify Terex for the losses it suffered because of the Residual Value Guarantee.

The Terex II Transaction. In December 2001, Apuzzo caused Terex to participate in a second three-party transaction ("Terex II"). Like Terex I, Terex II was designed to allow URI to

8

meet its earnings goals and to allow Terex to make a large sale of new equipment to URI. Terex II was structured similarly to Terex I. Specifically, URI sold used equipment to GECC and leased it back for several months; Terex agreed to resell the equipment and it provided GECC with the same 96% Residual Value Guarantee; and URI, in turn, secretly agreed to indemnify Terex for the losses it incurred because of the Residual Value Guarantee. As with Terex I, the Terex II documents concealed the "interlocking nature" of the three-party transaction. Compl. ¶ 41. Apuzzo understood that URI wanted the agreements between URI and GECC and URI and Terex to be kept separate, because on December 19, 2001, a Terex sales manager emailed Apuzzo to ensure that Apuzzo kept the transactions "on two separate documents." Compl. ¶ 42. Apuzzo signed the Terex II Remarketing Agreement with GECC even though he knew that it did not disclose URI's commitment to indemnify Terex and even though he knew that the agreement committed Terex to resell the equipment at 96% of the purchase price that GECC had paid URI.

As with Terex I, Apuzzo knew that URI had inflated the price of the equipment it was selling to GECC in Terex II,[3] and he knew that Terex was likely to lose money under the Residual Value Guarantee. Therefore, Apuzzo again insisted that URI indemnify Terex for these anticipated losses. To disguise the indemnification payments for Terex II, URI paid Terex a $4 million "premium" on the purchase of $24 million in new equipment; this premium was designed to conceal the indemnification payment. Compl. ¶ 43. Additionally, Terex, with Apuzzo's knowledge, issued invoices inflating the value of the equipment to $28 million in order to avoid disclosure of the $4 million indemnification payment.

---

[3] As with Terex I, Terex had conducted its own appraisal for Terex II and determined that URI had overvalued the equipment it was selling to GECC.

Although Terex's sales managers negotiated directly with their URI counterparts regarding many of the details of the Terex II transaction, Apuzzo was involved throughout the process; he engaged in discussions and negotiations with Nolan, monitored email communications related to the three-party transaction, and had control over the final terms of the agreements.

**PROCEEDINGS BELOW**

Apuzzo moved to dismiss the Complaint in the district court. He argued that the Complaint failed to allege adequately the second and third elements of aiding and abetting securities fraud under *DiBella, supra*, i.e., that the defendant had actual knowledge of the fraud and that he rendered substantial assistance to the primary violator.[4]

The district court concluded that the SEC had adequately alleged actual knowledge of the violation. The district court found that:

> The [C]omplaint contains factual allegations which, taken as true, support a conclusion that Apuzzo knew URI was inflating the profits generated by URI's sales of the used equipment to GECC and also knew the material details as to the true structure of each of Terex I and Terex II; Apuzzo knew that the transactions were being documented in a manner that concealed the interlocking nature of the three-party agreements and thus failed to disclose the true structure of the transactions; Apuzzo knew that the results from the transactions would be inaccurately reflected in URI's financial statements if the true structure of the transactions was not known to URI's auditor; and Apuzzo knew that URI's auditor was being misled.

*SEC v. Apuzzo*, 758 F. Supp. 2d 136, 148 (D. Conn. 2010).

---

[4] Apuzzo also argued that most of the SEC's claims were barred by the applicable statute of limitations, and that the Complaint failed to satisfy the specificity requirement of Federal Rule of Civil Procedure 9(b). Because the district court found that the Complaint did not adequately allege that Apuzzo was an aider and abettor, it did not reach these alternate grounds for dismissal and they are not before us. *See SEC. v. Apuzzo*, 758 F. Supp. 2d 136, 146 (D. Conn. 2010).

But, the district court found that the SEC had not adequately alleged substantial assistance.  Specifically, the court held that "the [C]omplaint contains factual allegations which taken as true support a conclusion that there was a 'but for' causal relationship between Apuzzo's conduct and the primary violation, but do not support a conclusion that Apuzzo's conduct proximately caused the primary violation."  *Id*. at 152.[5]  Concluding that such proximate causation was required to satisfy the "substantial assistance" component of aider and abettor liability, the district court granted the motion to dismiss.  *Id.*  The SEC timely appealed.

**DISCUSSION**

Section 20(e) of the Securities Exchange Act of 1934 allows the SEC, but not private litigants, to bring civil actions against aiders and abettors of securities fraud. 15 U.S.C. § 78t(e). The SEC may bring such an action against "any person that knowingly provides substantial assistance" to a primary violator of the securities laws.  15 U.S.C. § 78t(e).[6]  Specifically, as noted above, the SEC must prove:  (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.  *DiBella*, 587 F.3d at 566.  Apuzzo conceded below that the SEC had adequately pleaded the existence of a primary violation, and he does not contest on appeal the

---

[5] Although the SEC's opposition to the motion to dismiss asked for leave to amend if the district court granted the defendant's motion to dismiss, the district court dismissed the complaint with prejudice and entered judgment.

[6] The Dodd-Frank Act of 2010 amended Section 20(e) to add the words "or recklessly" after "knowingly."  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. §78t(e)).  This amendment does not apply in this case.

district court's finding that the SEC adequately pleaded his actual knowledge of the fraud. Therefore, the only disputed question on appeal is whether the facts alleged plausibly plead that Apuzzo substantially assisted the primary violator in committing the fraud.[7]

In assessing this issue, we draw guidance from the well-developed law of aiding and abetting liability in criminal cases; for if the conduct of an aider and abettor is sufficient to impose criminal liability, *a fortiori* it is sufficient to impose civil liability in a government enforcement action. Nearly seventy-five years ago, Judge Learned Hand famously stated that in order for a criminal defendant to be liable as an aider and abettor, the Government – in addition to proving that the primary violation occurred and that the defendant had knowledge of it (the equivalent of the first two elements of *DiBella*) – must also prove "that he in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). The Supreme Court later adopted Judge Hand's formulation. *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949). In fact, as the Seventh Circuit has recognized, Judge Hand's standard is "[t]he classic formula for aider and

---

[7] Specifically, the SEC alleged that Apuzzo aided and abetted URI's violations of 15 U.S.C. §§ 78j(b) (prohibiting persons from using manipulative device in connection with purchase or sale of security), 78m(a) (requiring issuers to file periodic reports as required by SEC regulations), (b)(2)(A) (requiring issuers to make and keep books and records that accurately and fairly reflect the transactions of the issuer), 17 C.F.R. §§ 240.10b-5 (prohibiting any person from, inter alia, making any untrue statement of material fact, or omitting to state material fact necessary to make any statement not misleading), 240.13a-1 (requiring issuer to file annual reports), and Nolan's violation of 15 U.S.C. § 78m(b)(5) (prohibiting persons from knowingly circumventing or failing to implement a system of internal accounting controls, or falsifying books and records) and 17 C.F.R. § 240.13b2-1 (prohibiting persons from directly or indirectly falsifying or causing the falsification of any book or record).

12

abettor liability." *United States v. Irwin*, 149 F.3d 565, 569 (7th Cir. 1998).[8]  Judge Hand's standard has thus survived the test of time, is clear, concise, and workable, and governs the determination of aider and abettor liability in securities fraud cases.[9]

While Apuzzo argues that substantial assistance should, instead, be defined as proximate cause, his argument ignores the difference between an SEC enforcement action and a private suit for damages.  "Proximate cause" is the language of private tort actions; it derives from the need of a private plaintiff, seeking compensation, to show that his injury was proximately caused by the defendants' actions.  But, in an enforcement action, civil or criminal, there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation.

Thus, in *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985), a private securities fraud action that alleged aiding and abetting fraud (and that was decided prior to the Supreme Court's outright prohibition of private plaintiff claims for aiding and abetting

---

[8] In recent years, we have summarized Judge Hand's definition in the criminal context by stating that a defendant is liable as an aider and abettor if, in addition to knowing of the primary violation, he "consciously assisted the commission of the specific crime in some active way." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008); *see DiBella*, 587 F.3d at 566 (quoting this standard from *Ogando*).  *Ogando* and *Peoni* simply use different words to set forth the same requirements.

[9] As we have previously explained in another civil securities fraud case, Judge Hand's definition is likely the clearest definition possible, and the elaborate discussions of the aiding and abetting standard in other securities law cases may not "have added anything except unnecessary detail" to that definition.  *IIT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980) *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010).  In *Cornfeld*, after recognizing that Judge Learned Hand's definition was the clearest definition of the substantial assistance aspect of aiding and abetting, we applied that standard in a civil securities fraud case.  *Id.* at 925.

securities fraud in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)), we stated that the complaint "must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated," *id.* at 62. But there is no reason to carry this requirement over to the context of SEC enforcement actions. Indeed, this distinction is already implicit in some of the case law. Thus, while a plaintiff must prove reliance (a concept closely akin to causation) in a private securities fraud suit, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005), there is no such requirement in an SEC enforcement action, *see SEC v. KPMG LLP.*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).[10]

In fairness to the district court, our case law has not always made this distinction with clarity. In particular, the opinion in *DiBella* quotes the proximate cause language from *Bloor*, which may have led the district court to assume that the SEC was required to plead that the aider and abettor proximately caused the primary securities law violation. But *Bloor* only explained that the private plaintiff in that case had failed to plead that the alleged primary securities law violation proximately caused the plaintiff any harm. *Bloor* did not require the plaintiff to plead that the alleged aider and abettor had proximately caused the primary violation.

We now clarify that, in enforcement actions brought under 15 U.S.C. § 78t(e), the SEC is not required to plead or prove that an aider and abettor proximately caused the primary securities

---

[10] Further, in *Bloor*, we affirmed a judgment on the pleadings for defendants, who were alleged primary violators and aiders and abettors, because the plaintiff had not alleged facts sufficient to show that the primary securities violation identified in the complaint had proximately caused the investors' loss. 754 F.2d at 62. Thus, *Bloor* addressed the lack of a causal link between the primary violation and injury to investors, not the lack of a distinct causal link between the aider's substantial assistance and the primary violation. Because Apuzzo does not argue that there is any requirement that the SEC prove that the primary violation caused harm to investors, *Bloor* is inapposite.

law violation. In fact, the statute under which the SEC here proceeds, 15 U.S.C. § 78t(e), was passed in the wake of *Central Bank* precisely to allow the SEC to pursue aiders and abettors who, under the reasoning of *Central Bank*, were not the themselves involved in the making of the false statements that proximately caused the plaintiffs' injuries. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008). This statutory mandate would be undercut if proximate causation were required for aider and abettor liability in SEC enforcement actions.

Indeed, because only the SEC may bring aiding and abetting claims for securities law violations, many if not most aiders and abettors would escape all liability if such a proximate cause requirement were imposed, since, almost by definition, the activities of an aider and abettor are rarely the direct cause of the injury brought about by the fraud, however much they may contribute to the success of the scheme. We therefore welcome the opportunity to clarify that the appropriate standard for determining the substantial assistance component of aider and abettor liability in an SEC civil enforcement action is the Judge Hand standard set forth above.[11]

Applying the test we have laid out above, it is clear that the Complaint plausibly alleges that Apuzzo provided substantial assistance to the primary violator in carrying out the fraud, and therefore we must reverse the district court. Apuzzo associated himself with the venture, participated in it as something that he wished to bring about, and sought by his action to make it

---

[11] This is not to suggest that evidence of proximate cause may not be relevant to identifying when an aider and abettor has provided substantial assistance to a primary violator. One who proximately causes a primary violation with actual knowledge of the primary violation will inherently meet the test we have set forth above. Therefore, the SEC *may* prove substantial assistance by demonstrating that the aider and abettor was a proximate cause of the violation. Our recognition of 'proximate cause' as a factor relevant to identifying substantial assistance, however, does not establish proximate cause as a distinct element of an aiding and abetting claim.

15

succeed. Specifically, Apuzzo agreed to participate in the Terex I & Terex II transactions;[12] negotiated the details of those transactions, through which he extracted certain agreements from URI in exchange for Terex's participation; approved and signed separate agreements with GECC and URI, which he knew were designed to hide URI's continuing risks and financial obligations relating to the sale-leaseback transactions in furtherance of the fraud; and approved or knew about the issuance of Terex's inflated invoices, which he also knew were designed to further the fraud.

Apuzzo argues that his participation in the transactions alone is insufficient to demonstrate substantial assistance because, he contends, "there is simply no allegation in the Complaint that these transactions were unusual." Appellee's Br. at 30. This, however, is doubly erroneous, both because Apuzzo's substantial assistance extended beyond his agreement to participate in the transactions and because the well-pleaded allegations of the Complaint aver that these transactions were hardly ordinary transactions. Thus, for example, the Complaint alleges that the agreements detailed in the Complaint "were *designed* to hide URI's continuing risks and financial obligations" Compl. ¶ 2 (emphasis added), and that "Apuzzo *knew* . . . that the three-party transaction was *designed* to inflate the gain that URI would recognize from the sale-leaseback transaction by *disguising* the indemnification payment to Terex," Compl. ¶ 45. (emphases added). At this stage, we must view the SEC's plausible allegations as true.

---

[12] Although Apuzzo took on more of a supervisory role for Terex II and was less involved in some of the day to day communication with URI, his actions were more than sufficient to meet the substantial assistance standard set forth above. He retained ultimate control over the transaction, negotiated its key terms with Nolan and URI, approved the agreements with URI and GECC, and knew about the issuance of inflated invoices.

16

Moreover, when evaluating whether Apuzzo rendered substantial assistance, we must consider his high degree of actual knowledge of the primary violation (the second component of aiding and abetting). As we have repeatedly held, the three components of the aiding and abetting test "cannot be considered in isolation from one another." *DiBella*, 587 F.3d at 566 (quoting *Cornfeld*, 619 F.2d at 922). Where, as here, the SEC plausibly alleges a high degree of actual knowledge, this lessens the burden it must meet in alleging substantial assistance.

Apuzzo argues that while a high degree of substantial assistance lowers the SEC's burden to prove scienter, the converse is not true. A close look at our case law, however, reveals that Apuzzo is incorrect. In *DiBella*, when discussing the knowledge factor of the aiding and abetting test, we stated that "'there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance.'" *Id.* at 566 (quoting *Cornfeld*, 619 F.2d at 922) (brackets omitted). And, in *Cornfeld*, we explained that we "must consider" the issue of substantial assistance in light of the allegations that the defendants "actually knew" of the fraud. 619 F.2d at 925. Therefore, a high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*.

It is particularly appropriate to consider the degree of scienter in evaluating substantial assistance in light of the test for substantial assistance that we have laid out above. When determining whether a defendant sought by his actions to make the primary violation succeed, if a jury were convinced that the defendant had a high degree of actual knowledge about the steps he was taking and the role those steps played in the primary violation, they would be well

17

justified in concluding that the defendant's actions, which perhaps could be viewed innocently in some contexts, were taken with the goal of helping the fraud succeed.

As quoted above, the district court found that the Complaint here alleges, in detail, a very high degree of knowledge of the fraud on Apuzzo's part. Considered in light of those allegations, the allegations of substantial assistance can no longer be viewed, as Apuzzo argues, as "business as usual," but rather as an effort to purposely assist the fraud and help make it succeed.

It remains only to note that Apuzzo makes several additional arguments in support of his position that the Complaint was properly dismissed, but none is persuasive:

First, as part of his proximate cause argument, Apuzzo argues that Nolan's actions were superseding and intervening causes that vitiate Apuzzo's liability for the fraud. As we have stated above, the SEC is not required to prove proximate causation in this case. Moreover, Apuzzo's argument is without merit for the independent reason that URI's acts were entirely foreseeable, indeed the SEC has plausibly pleaded that Apuzzo knew that URI structured the three-party agreements to allow it to make false and misleading statements about its revenue. Of course, "'[i]f the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from defendant's conduct, it may well be a superseding act which breaks the causal nexus.'" *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 (2d Cir. 1995) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980)). But here, the primary violator's acts were entirely foreseeable. The primary violator will often be the one to take the final actions necessary to consummate the fraud, and a primary violator's *foreseeable* acts are not superseding and intervening causes of the fraud.

18

Second, Apuzzo argues that "this case is quite unlike typical substantial-assistance cases where an in-house officer or employee oversees fraudulent transactions or accounting entries *by his company*." Appellee's Br. at 27 (emphasis in original). The standard suggested by Apuzzo would essentially require that the aider and abettor be a staff member of the same company or government entity as the primary violator. Even if it were true that aiders and abettors are typically employees of the same company or government entity as the primary violator, that is certainly not a requirement of our case law. *See, e.g.*, *DiBella*, 587 F.3d at 567. To create such a requirement would mean ignoring prior precedent, and it would also impose an overly narrow reading of the aiding and abetting test that would unduly hinder the SEC's ability to exercise its statutory mandate. *See Stoneridge*, 552 U.S. at 158.[13]

Third, at oral argument, Apuzzo repeatedly relied on *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979). That case, however, is inapposite. As an initial matter, the portion of *Edwards & Hanly* that discussed aiding and abetting liability was dictum. In that case, we said that we did not need to decide the aiding and abetting question, because we could "dispose of the appeal" without considering that issue. *Id.* at 485. We reversed the district court's decision on the grounds that defendant was entitled to an affirmative defense because the plaintiff's "failure to act was the effective cause of its loss." *Id; see also*

---

[13] The district court also found it significant that various allegations were absent from the Complaint; specifically, it noted that the SEC had not alleged that Apuzzo "creat[ed] the structure" of the transactions, that Apuzzo "was the person responsible for bringing the respective parties to the three-party agreement," or that Apuzzo "was the person who caused the modifications to the transaction documents so as to conceal the interlocking nature of the three-party agreements." *Apuzzo*, 758 F. Supp. 2d at 152. While these allegations may be necessary to support an allegation of primary liability, they are not necessary to adequately plead an aiding and abetting violation.

19

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir. 1982) (recognizing that this portion of *Edwards & Hanly* is dictum).

Moreover, *Edwards & Hanly*'s discussion in dictum of the defendant's liability for aiding and abetting focused on whether the defendant's agent, Joseph Werba, had a duty to speak and failed to do so.[14] Although we discussed Werba's other acts, we explicitly stated that the plaintiff's aiding and abetting claim was premised on Werba's "silence in the face of alleged 'knowledge'" of the primary violator's actions. *Id.* at 484. We then noted that Werba likely had no fiduciary duty to speak. *Id.* Apuzzo correctly conceded at oral argument, however, that cases involving silence in the face of an alleged duty to speak are different from those where affirmative acts are at the core of the aiding and abetting claims. As we stated in *Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983), mere "[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Id.* at 91. If the allegations were merely that Apuzzo failed to report the fraud, that would present an entirely different case, and if Apuzzo lacked a duty to report, he would not be liable. But, the Complaint here is premised on affirmative acts that Apuzzo took in support of the fraudulent scheme.

Fourth, Apuzzo also spent significant time at oral argument and in his briefs arguing that the inflated invoices were not relevant, since, according to Apuzzo, there was no allegation in the

---

[14] The defendant was actually Wells Fargo Securities Clearance Corporation, which was allegedly liable due to the acts of Werba, its agent and former president. *Edwards & Hanly*, 602 F.2d at 482-83.

20

Complaint that URI's auditors ever saw those invoices.[15]  Even if the invoices were never seen by URI's auditors, they are still evidence of Apuzzo's substantial assistance.  The invoices provide strong evidence that Apuzzo associated himself with the venture, participated in it as something that he wished to bring about, and sought by his action to make it succeed.  And, in any event, at this stage of the case, drawing all reasonable inference in favor of the SEC, it is certainly a reasonable inference from the Complaint that the invoices were actually used.[16]  The SEC represented at oral argument that it had no reason to believe that the invoices were not used.  Moreover, discovery was ongoing when the motion to dismiss was decided, and the SEC stated at oral argument that the question of whether invoices were used by URI and its auditors has not yet been the focus of discovery inquiries.  Of course, invoices are normally necessary when dealing with a transaction of this magnitude, and there is no dispute that the $25 million was in fact entered on URI's books.  Therefore, at this stage, it would be inappropriate to dismiss the case on the theory that the invoices were not in fact used.

---

[15] The Complaint alleges that "Nolan forwarded the inflated invoices to URI's accounting department, knowing that the accounting department would enter the incorrect prices in URI's books and records."  Compl. ¶ 45.  The invoices were important to the coverup of the fraudulent scheme, and a plausible inference at this stage is that they were important in the decision of Nolan, the primary violator, to proceed with the primary violation.  Because Apuzzo assisted in the formation of a scheme, and it is reasonable to infer that Nolan relied on the invoices in making his determination as to whether to go forward with the scheme, it is not necessary for the SEC to allege that the invoices that Apuzzo provided were ultimately used to convince another person of the mischaracterizations that were part of the fraudulent scheme.  If this were not the case, then there would be a huge loophole in the statute, making liability dependent on proving that auditors looked at a particular document.

[16] Apuzzo makes a similar argument with regard to the agreements he signed, namely that they were not disclosed to URI's auditors.  As discussed above with respect to the invoices, even if the agreements were not disclosed, it would not affect Apuzzo's liability.

21

## CONCLUSION

In sum, applying the standard we have set forth for evaluating substantial assistance, we conclude that the Complaint should not have been dismissed because it adequately alleged that Apuzzo aided and abetted the primary violator in carrying out his fraudulent scheme. We therefore reverse the district court's Opinion and remand for further proceedings consistent with this opinion.