**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Jack J. EGAN, Jr., Defendant.**

**No. 13 Civ. 236 WHP.**

United States District Court, S.D. New York.

Jan. 31, 2014.

Charles D. Stodghill, Cory C. Kirchert, Washington, D.C., for Plaintiff.

Paul H. Schoeman, Jeremy A. Cohen, Andrew J. Estes, Kramer, Levin, Naftalis & Frankel, LLP, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge.

The Securities and Exchange Commission ("SEC") brings this accounting fraud action against Jack J. Egan, Jr., C.P.A., alleging violations of the Securities Exchange Act of 1934, the Securities Act of 1933, and the Exchange Act Rules. Egan moves under Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss the claims sounding in fraud for failure to state a

claim and failure to plead scienter adequately. For the following reasons, Egan's motion is denied.

## BACKGROUND

The allegations of the Complaint are accepted as true for the purposes of this motion. From January 1992 to August 2011, Egan was the senior vice president, chief financial officer ("CFO"), and principal financial officer of Volt Information Systems, Inc. ("Volt"). (Compl. ¶ 16.) Volt's subsidiary, Volt Delta Resources, LLC ("VDR"), provides computer-based directory assistance. (Compl. ¶ 18.) Verizon[1] was one of VDR's most important customers. (Compl. ¶¶ 2–3, 22)

In 2006, VDR learned that Verizon was considering switching to a competitor. (Compl. ¶ 26.) To keep Verizon's business, VDR offered to develop and lease customized directory assistance software for Verizon, anticipating that the lease would begin in 2008. (Compl. ¶¶ 26–27.) VDR proposed two pricing models for a four-year lease, requiring either annual license and maintenance fees and a down payment of $4.5 million or per-usage fees and a down payment of $27 million. (Compl. ¶¶ 28, 30.) Under either model, VDR would recognize more than $70 million in revenue over the four-year period. (Compl. ¶ 29.) Egan reviewed and "edited" VDR's proposal. (Compl. ¶¶ 31, 33.)

In early December 2006, Verizon informed VDR that it had an opportunity to secure $10 million in internal funding if it could purchase a capital asset[2] before the end of the year. (Compl. ¶ 36.) VDR's proposed annual license would not qualify as a capital asset, but a purchase or per-

petual license of VDR software would. To help Verizon obtain the internal funding, VDR issued two price quotes for the sale or perpetual license of four software modules at the core of the new program. (Compl. ¶¶ 38, 39.) In reality, however, the purported sale was a sham; the two entities continued negotiating for a long-term lease of the same modules. (Compl. ¶¶ 38, 39.)

Verizon obtained the internal funding using VDR's price quotes. (Compl. ¶¶ 40, 48.) VDR and Verizon created additional documentary support for the transaction, including a $10 million purchase order for the software modules and a pricing schedule allocating the total purchase price among four modules. (Compl. ¶¶ 40–41.) VDR and Verizon characterized the $10 million as a deposit on their future licensing contract for the software. (Compl. ¶¶ 37, 49.) To assure Verizon that VDR would continue to negotiate a long-term lease in good faith after receiving the $10 million, Egan reviewed and edited a "commitment letter" to Verizon. (Compl. ¶ 45.) By mistake, Verizon transferred the $10 million to Volt rather than VDR. (Compl. ¶ 48.) When the error was discovered, Egan authorized transfer of the funds to VDR. (Compl. ¶ 48.)

In the spring of 2007, a final agreement eluded VDR and Verizon. (Compl. ¶ 51.) By a memorandum of understanding, VDR promised to refund the $10 million if no agreement was reached. (Compl. ¶¶ 51–52.) Egan participated in the ongoing negotiations. (Compl. ¶ 53.) In early October 2007, Egan asked Volt's assistant controller for the memorandum of under-

---

**1.** Although the Complaint refers only to VDR's Key Customer, the motion papers indicate Verizon is the VDR's key customer. (Mem. Supp. Egan's Mot. Dismiss 1.)

**2.** A "capital asset" is a "long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant." *Black's Law Dictionary* 134 (9th ed.2009).

standing between VDR and Verizon. (Compl. ¶ 57.)

On October 25, 2007, Verizon accepted two of the software modules. (Compl. ¶¶ 54–55.) VDR drafted a formal acceptance letter, (Compl. ¶ 54), "releas[ing]" $7.55 million of the $10 million to VDR. (Decl. Paul H. Schoeman Ex. C at 2; Mem. Supp. Egan's Mot. Dismiss 5, 14.) The letter continued the façade that a sale had occurred by stating that VDR had transferred physical possession of the modules to Verizon. (Compl. ¶ 55.)

Two days later, VDR created a project recognition worksheet showing a sale of the two software modules. (Compl. ¶ 59.) The next day, the last day of Volt's fiscal year, VDR's CFO recognized the $7.55 million as revenue, recorded $2.1 million in development costs for the two modules, and created journal entries to reflect a sale, indicating that the modules had been sold or perpetually leased. (Compl. ¶¶ 60–61.) Egan learned of VDR's revenue recognition after the fiscal year ended. (Compl. ¶ 62.) On November 14, 2007, expecting a "much bigger boost to earnings" from the initial transaction, Egan requested more information from VDR. (Compl. ¶ 63.) On November 16, 2007, VDR and Verizon executed a four year lease of the modules beginning January 1, 2008 at a cost of more than $70 million. (Compl. ¶ 65.)

In December 2007, Egan discussed VDR's recognition of the $7.55 million as revenue with Volt's external auditor. (Compl. ¶ 70.) VDR had provided only the purchase order, acceptance letter, and journal entries to the auditor. (Compl. ¶ 68.) Egan failed to correct the outside auditors' erroneous understanding that the two modules had been "sold or perpetually leased." (Compl. ¶ 72.) Nor did he offer any other documents or information regarding the $10 million December 2006 transaction. (Compl. ¶¶ 72–73.)

Under generally applicable accounting principles ("GAAP"), public companies may only recognize revenue if "[p]ersuasive evidence of an arrangement exists." (Compl. ¶ 6 (quoting Staff Accounting Bulletin No. 104, 68 FR 74,436, 74,436 (Dec. 23, 2003)).) An "arrangement" is "the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction." (Compl. ¶ 7 (quoting Staff Accounting Bulletin No. 104, 68 FR 74,436, 74,436 n. 3).)

## DISCUSSION

### I. *Motion to Dismiss*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "[F]actual content that is 'merely consistent with,' rather than suggestive of, a finding of liability will not support a reasonable inference." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir.2013). "[T]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (internal quotation marks omitted).

In ruling on a motion to dismiss, "the court is required to proceed 'on the as-

sumption that all the [factual] allegations in the complaint are true.'" *Anderson News*, 680 F.3d at 185 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The court, however, need not accept legal conclusions, "and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (internal quotation marks omitted). The court must "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News*, 680 F.3d at 185.

"[C]ourts must consider the complaint in its entirety, as well as ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam)); *see also Faulkner v. Beer*, 463 F.3d 130, 133–35 (2d Cir.2006) (holding that a document outside of the record may become the basis for a dismissal if it is integral to the complaint and there is no dispute as to its authenticity or accuracy). The SEC's Complaint relies heavily on the commitment letter, acceptance letter, and documents comprising the "Purported Contract of Sale." [3] Because those documents are integral to the SEC's claims, this Court may consider

them. *See Chambers*, 282 F.3d at 153–54; *Int'l Audiotext*, 62 F.3d at 72. Of course, any ambiguities in the documents are resolved in a plaintiff's favor. *See Int'l Audiotext*, 62 F.3d at 72.

## II. *Rule 9(b)*

■ Claims sounding in securities fraud must meet the heightened pleading requirements of Rule 9(b). *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). Because Rule 9(b) offers defendants important protections, the Second Circuit applies Rule 9(b)'s heightened standard not only to claims explicitly alleging fraud, but also to claims sounding in fraud, such as where "the wording and imputations of the complaint are classically associated with fraud." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir.2004). "Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 556 (S.D.N.Y.2004) (quoting *Shields*, 25 F.3d at 1128) (internal quotation marks omitted).

■ In addition to providing a facially plausible claim to relief, a party "must state with particularity the circumstances constituting fraud or mistake." Fed. R.Civ.P. 9(b). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R.Civ.P. 9(b), the relaxation of the particularity requirement for conditions of mind must not be mistaken for a "license to base claims of fraud on speculation and conclusory allegations." *Acito v. IMCERA Grp.*,

---

**3.** *See* Compl. ¶¶ 45–47, 69, 73 (commitment letter); ¶¶ 54–56, 58–59, 63, 68 (acceptance letter); ¶¶ 2–3, 9, 37–41, 43–44, 61–64, 68

(contract of sale or document comprising contract of sale).

*Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (citations and internal quotation marks omitted). Thus, plaintiffs alleging conditions of mind must "allege facts that give rise to a strong inference of fraudulent intent." *Chill v. Gen. Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996); *Acito,* 47 F.3d at 52. Plaintiffs may establish this inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito,* 47 F.3d at 52 (quoting *Shields,* 25 F.3d at 1128).

■ "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields,* 25 F.3d at 1130. Plaintiff may not assert a motive possessed by nearly all corporate insiders, but must "allege that defendants benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000). As the SEC attributed no motive to Egan's conduct in the Complaint other than implying a general "desire for the corporation to appear profitable," the SEC fails to allege an improper motive. *See Kalnit,* 264 F.3d at 139.

■ Absent allegations of improper motive, the SEC may still plead sufficient circumstantial evidence of conscious misbehavior or recklessness to raise the requisite inference of scienter, but "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit,* 264 F.3d at 142 (internal quotation marks omitted). Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak,* 216 F.3d at 308 (citation and internal quotation marks omitted). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak,* 216 F.3d at 308, 311.). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak,* 216 F.3d at 308.

■ "Allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong" may create an inference of scienter. *S.E.C. v. Espuelas,* 579 F.Supp.2d 461, 478 (S.D.N.Y.2008). For example, "it does not require [specialized accounting] knowledge to know that the recognition of all the revenue for sales that were entirely contingent on further approval of the buyer was improper." *Espuelas,* 579 F.Supp.2d at 482 (finding the complaint adequately pled strong circumstantial evidence of recklessness as to that defendant); *cf. Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 574 (2d Cir.1982) (refusing to overturn jury verdict finding fraud where a CEO negotiated contract for consignment transactions and his company recorded the transactions as sales). But where accounting standards are neither simple nor easily applied, a plaintiff cannot rely on misapplication of the accounting rules alone. *In re Bristol–Myers,* 312 F.Supp.2d at 566–67 (holding that where

application of GAAP principle to facts was complex, no strong inference of scienter could be inferred).

 Here, the SEC pleads that Egan knew that VDR could not properly recognize $7.55 million in revenue until the completion of the VDR/Verizon negotiations. As an active participant in those negotiations, Egan knew VDR and Verizon finalized a four-year lease of directory assistance software after Volt's 2007 fiscal year ended. The SEC also alleges that Egan understood the $7.55 million in revenue related to that same directory assistance software because he reviewed descriptions of the $10 million, December 2006 transaction, including the acceptance letter, the memorandum of understanding, and an "actual sales and profit" statement. No specialized accounting knowledge is required to recognize that the same assets cannot be sold and then leased a few months later or that revenue is not earned from sham sales. Further, the memorandum of understanding assured Verizon that the funds were refundable until a final agreement was executed. No specialized knowledge was required to understand the impropriety of recognizing revenue that was contingent on future action by a buyer. *Espuelas*, 579 F.Supp.2d at 482.

Egan also failed to disclose to Volt's external auditor the final agreement concerning the same software modules during a discussion about the propriety of recognizing the revenue. The SEC alleges Egan misled the auditors and made public statements despite knowing contradictory, non-public information. Accordingly, the Complaint pleads sufficiently a strong inference of fraudulent intent through recklessness. *See Espuelas*, 579 F.Supp.2d at 482–83.

 Further, the Complaint pleads more than recklessness. By alleging that Egan possessed accounting expertise and

was confronted with multiple indicators of fraudulent activity, the SEC pleads "strong circumstantial evidence of conscious misbehavior." *See Acito*, 47 F.3d at 52; *Espuelas*, 579 F.Supp.2d at 482–84 (noting that an obvious GAAP violation by one possessing accounting expertise creates inference of actual knowledge); *cf. In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F.Supp.2d 192, 240 (S.D.N.Y.2004) (finding GAAP violations and "red flags" sufficient to support a claim of scienter under Rule 9(b) and similar private securities litigation standard). Egan is an accounting professional accused of an obvious GAAP violation. Although "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," *Novak*, 216 F.3d at 309, GAAP violations pled in concert with allegations of expertise and obvious fraud may be sufficient to survive a motion to dismiss. *Cf. Stephenson v. PricewaterhouseCoopers, LLP*, 482 Fed.Appx. 618, 623 (2d Cir.2012) ("[A] complaint may sufficiently plead that an auditor acted recklessly by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." (internal quotation marks omitted)); *Chill*, 101 F.3d at 270 (noting that GAAP violations pled with facts creating an inference of intentional misconduct or recklessness would survive a motion to dismiss).

 Alternatively, a complaint alleging that a defendant is responsible for revenue recognition policies during a time of large-scale, long-term GAAP violations sufficiently alleges circumstantial evidence of actual knowledge. *In re Am. Bank Note Holographics Sec. Litig.*, 93 F.Supp.2d 424, 446–47 (S.D.N.Y.2000). The Complaint alleges a year-long pattern of activi-

ty contributing to the fraud. Egan not only possessed accounting expertise, but as Volt's CFO was responsible for revenue recognition policies. He was confronted with multiple "red flags" indicating fraud. Accepting the allegations in the Complaint as true, the "red flags" could not have a non-fraudulent explanation. *Cf. Chill,* 101 F.3d at 270 (finding that because record profits could be obtained by non-fraudulent means, the defendant had not been confronted with a "red flag"). Although the scale of the scheme is smaller than that in *Holographics,* the Complaint alleges sufficient circumstantial evidence to plead that Egan, as an accountant and as CFG, knew that recognizing revenue for a sham sale or a deposit is improper. *See Espuelas,* 579 F.Supp.2d at 474–76, 482–84; *Holographics,* 93 F.Supp.2d at 446–47.

Egan's arguments to the contrary miss the mark. He claims that accounting for software revenue recognition is notoriously difficult. (Mem. Supp. Egan's Mot. Dismiss 20–21.) He also maintains that Volt had a history of accounting for software revenue incorrectly. (Mem. Supp. Egan's Mot. Dismiss 9.) But these arguments are irrelevant because the Complaint alleges no valid agreement existed when Volt recognized the revenue. And Egan's argument that the December 2006 transaction was a valid transaction is a factual dispute, not a challenge to the sufficiency of the complaint.

Egan advances a number of other factual arguments that are irrelevant on a motion to dismiss. First, he claims the acceptance letter indicates that the funds were not contingent on the parties' future negotiations. As discussed above, this Court may consider the acceptance letter because of the emphasis the SEC gives it in the Complaint. The acceptance letter purports to "release" the funds to VDR, im-

plying that Verizon would not ask for their return and therefore recognizing the revenue was reasonable. Second, Egan suggests that because VDR executed the lease agreement on the last day of the fiscal year, he may have thought the transaction was complete. Third, Egan suggests that as CFO of VDR's parent, he was unfamiliar with the relevant transactions.

But, taking all inferences in favor of the SEC, the Complaint alleges sufficient circumstantial evidence to suggest that Egan knew the purported December 2006 sale was a sham and knew that the parties had not reached a final agreement. The circumstances alleged in the Complaint, including Egan's active participation in negotiations, his requests for the memorandum of understanding and a sales and profit report, and his receipt of the acceptance letter, creates a strong inference that Egan understood the transactions and was aware that Verizon did not sign the final agreement for another two weeks. Thus, the Complaint pleads sufficient circumstantial evidence to survive a Rule 9(b) motion by alleging that Egan consciously misbehaved in withholding information from an auditor and making public statements despite knowing contradictory, non-public information.

### III. *Third and Fifth Claims: Scienter Required for Aiding and Abetting*

■■■ The Private Securities Litigation Reform Act of 1995 (PSLRA) imposes liability on aiders and abettors who "knowingly provide substantial assistance to another['s]" violation of the securities laws. PSLRA, Pub.L. 104–67 § 104, *amended by* Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, Title VII, § 9290 (2010) (codified as amended at 15 U.S.C. § 78t(e) (2006)).[4]

---

**4.** In 2010, Congress amended aider and abet-

tor liability to include any person who "know-

Before the PSLRA, aiders and abettors were also liable for reckless omissions of fiduciary duties that substantially assisted a primary violation under Second Circuit case law. *See, e.g., Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983), *abrogated on other grounds by Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 360 (2d Cir.1990); *IIT v. Cornfield,* 619 F.2d 909, 927 (2d Cir.1980), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank, Ltd.,* 561 U.S. 247, 130 S.Ct. 2869, 2879, 177 L.Ed.2d 535 (2010). Whether Congress intended to codify the pre–1995 case law through the PSLRA "is a long-contested issue about which courts in this District have disagreed." *SEC v. Aronson,* No. 11 Civ. 7033(JSR), 2013 WL 4082900, at *11 (S.D.N.Y. Aug. 6, 2013); *compare Espuelas,* 579 F.Supp.2d at 484 (noting on motion to dismiss that "actual knowledge is the standard for aiding and abetting ..."), *and S.E.C. v. KPMG LLP,* 412 F.Supp.2d 349, 383 (S.D.N.Y.2006) (noting at summary judgment that "[t]he contention that Section 20(e) was intended to codify existing law is a tenuous one"), *with SEC v. Landberg,* 836 F.Supp.2d 148, 157 (S.D.N.Y.2011) (noting on motion to dismiss that "[t]he scienter standard in this Circuit included recklessness prior to Dodd–Frank"), *and SEC v. Lybrand,* 200 F.Supp.2d 384, 400 (S.D.N.Y.2002) (noting at summary judgment that "[t]he SEC contends that recklessness meets the scienter requirement here .... the SEC's arguments are compelling....").

Regardless of which standard applies, the Complaint sufficiently alleges that Egan possessed actual knowledge that the revenue recognition was improper. There-

fore Defendant's motion to dismiss the Third and Fifth Claims is denied.

### IV. *Fourth and Sixth Claims: Exchange Act Rule 13a–14 and Exchange Act Section 13(b)(5)*

 Egan argues that he lacked sufficient knowledge to be liable for violations of Exchange Act Rule 13a–14 and Exchange Act Section 13(b)(5). Exchange Act Rule 13a–14 requires principal financial officers to execute a certification for certain public filings. 17 C.F.R. § 240.13a–14. Exchange Act Section 13(b)(5) bans the knowing falsification of certain books or accounts. *SEC v. Stanard,* No. 06 Civ. 7736(GEL), 2009 WL 196023, at *30 (S.D.N.Y.2009) As described above, the Complaint alleges sufficiently that Egan knew of the GAAP violation, and therefore Egan's motion to dismiss these claims is also denied.

### CONCLUSION

For the foregoing reasons, Jack J. Egan's motion to dismiss is denied. The Clerk of Court is directed to terminate the motion pending at ECF No. 14.

SO ORDERED.

---

ingly *or recklessly* provides substantial assistance to another person['s]" violation. *See* 15 U.S.C. § 78t(e); Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, Title VII, § 9290, 124 Stat.

1761, 1862, 1865 (2010) (emphasis added). This amendment does not apply in this case because the alleged fraudulent acts took place in 2007. *See SEC v. Apuzzo,* 689 F.3d 204, 211 n. 6 (2d Cir.2012).