SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

CHINA NORTHEAST PETROLEUM HOLDINGS LIMITED; Wang Hongjun (a/k/a Hongjun Wang); Ju Guizhi (a/k/a Guizhi Ju); and Jiang Chao (a/k/a Chao Jiang), Defendants,

Jiang Mingfu (a/k/a Mingfu Jiang); and Sun Jishuang (a/k/a Jishuang Sun), Relief Defendants.

No. 12 Civ. 8696(NRB).

United States District Court, S.D. New York.

Signed March 26, 2014.

Filed March 27, 2014.

Alfred A. Day, Ansu Nath Banerjee, U.S. Securities & Exchange Commission, Washington, DC, for Plaintiff.

Michael J. Coffino, The Crone Law Group, San Francisco, CA, Jaime Jane Santos, Coffino Law Group, San Francisco, CA, Joseph N. Akrotirianakis, Atkinson Andelson Loya Ruud & Romo, Cerritos, CA, Michael Li–Ming Wong, Thad Davis, Gibson, Dunn & Crutcher, LLP, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff, the Securities and Exchange Commission (the "SEC" or "plaintiff"), brings this action against China Northeast Petroleum Holdings Limited ("CNEP" or the "Company"), its former CEO Wang Hongjun ("Wang"), its former director Ju Guizhi ("Ju"), and its former Vice President of Corporate Finance and Secretary Jiang Chao ("Chao"), as well as against relief defendants Sun Jishuang ("Sun") and Jiang Mingfu ("Mingfu").[1]  The SEC's complaint (the "Complaint") asserts the following claims: (1) securities fraud against all defendants under Section 17(a)

---

1. For the purposes of this Memorandum and Order, we will refer to CNEP, Wang, Ju, and Chao collectively as "all defendants." When CNEP is omitted from the group, we will refer the remaining defendants as "the individual defendants."

of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5; (2) books and records liability against CNEP, Wang, and Ju for violations of Exchange Act Sections 13(a), 13(b)(2), and 13(b)(5), and of Rules 13a–1, 13a–11, 13a–13, and 13b2–1; (3) aiding and abetting liability against all individual defendants for violations of Exchange Act Sections 10(b), 13(a), and 13(b)(2), and of Rule 10b–5; and (4) control person liability against Wang and Ju under Section 20(a) of the Exchange Act.

Presently before the Court are three motions to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Procedure 12(b)(6)—one filed by CNEP, a second by Wang and Sun, and a third by Chao. The SEC has also moved to serve defendant Ju by alternative means. For the reasons set forth below, defendants' motions to dismiss are denied, and plaintiff's motion to serve Ju by alternative means is also denied.

## BACKGROUND

### I. Factual Background

#### A. Defendants

CNEP is a Nevada corporation that engages in principally oil exploration, drilling, and production in China. Cmplt. ¶¶ 2, 11. It was formed in April 2004 through a reverse merger with a U.S. shell corporation and began trading on the NYSE Amex LLC ("NYSE") on June 15, 2009. *Id.* ¶ 12. However, CNEP was delisted from the NYSE on July 16, 2012 and, as of the filing of the Complaint on November 27, 2012, its common stock traded over-the-counter at $0.22 per share. *Id.* ¶ 14.

In addition to the Company, there are three individual defendants. The first, Wang, was the chairman of CNEP's Board of Directors, CEO, and President of the Company from at least January 1, 2009 through May 23, 2010, at which time he resigned from his position as chairman and was placed on leave from his position as CEO and President. *Id.* ¶ 15. During the time period referenced in the Complaint, Wang was the single largest shareholder of CNEP stock, owning 26% of the outstanding shares according to a December 31, 2009 10–K report. *Id.* The second individual defendant is Ju Guizhi ("Ju"). One of CNEP's founders, she is also Wang's mother and served as a director of the Company from November 2009 through May 2010. *Id.* The SEC claims that Ju was heavily involved in the day-to-day operations of CNEP despite her lack of title, and as of February 15, 2012, she also served as General Manager of two CNEP subsidiaries. *Id.* ¶ 16. Jiang Chao ("Chao"), the former Vice President of Corporate Finance and Secretary of CNEP, is the third individual defendant. *Id.* ¶ 17. All three defendants are Chinese nationals, although Wang resides part-time in California and Chao resides in Jersey City, New Jersey. *Id.* ¶¶ 15, 17.

The SEC also includes two relief defendants in its Complaint. The first is Sun, who is Wang's wife and the alleged recipient of $300,000 in improperly diverted funds. *Id.* ¶ 18. Although she has served as the Treasurer/Cashier of CNEP since November 2010, she was not working in that capacity at the time of the $300,000 transfer. *Id.* The second relief defendant is Mingfu, Chao's father. *Id.* ¶ 19. The SEC alleges that he improperly received $910,000 from the Company while not serving CNEP in any capacity. *Id.*

#### B. Allegations in the Complaint

Shortly after CNEP company stock began trading on the NYSE in June of 2009, the Company filed a Form S–3 registration statement that registered public offerings

of up to $40 million of securities. *Id.* ¶ 20. Wang signed the statement, and it stated that CNEP would "use the net proceeds from the sale ... for general corporate purposes, which may include working capital, capital expenditures, acquisitions of new technologies or businesses, and investments." *Id.* Chao then appeared at road shows and made presentations to investors in support of CNEP's upcoming public offering. *Id.* ¶ 21.

On September 16, 2009 the Company announced the public offering of CNEP stock in a Form 8–K signed by Wang. *Id.* ¶ 22. This 8–K included a press release, with Chao listed as the contact person, which stated that the Company would "use the net proceeds from the offering to fund its future business expansion plan, and for general working capital purposes." *Id.* On December 15, 2009, CNEP filed another Form 8–K, also signed by Wang, which announced a second offering of CNEP stock. *Id.* ¶ 23. In the associated press release, which again listed Chao as the Company's contact person, CNEP represented that it planned to "use the net proceeds from the offering to redeem its 8% Senior Debenture ... and for general working capital purposes." *Id.* Combined, the September 2009 and December 2009 offerings raised approximately $31.9 million. *Id.* ¶¶ 5, 24.

It is undisputed that there were at least three related-party transfers during this time period. First, on November 3, 2009, Chao authorized the transfer of $500,000 from CNEP's U.S. Bank Account (the "CNEP Account") to the personal bank account of his father, Mingfu. *Id.* ¶ 26. Next, on November 19, 2009, Chao effected a transfer of $300,000 from the CNEP Account to Sun, Wang's wife. *Id.* ¶ 28. And finally, on December 16, 2009, Chao authorized an additional transfer from the CNEP Account to Mingfu, this time for

the sum of $410,000. *Id.* ¶ 26. Prior to the Company's public offerings, the CNEP Account balance was approximately $84,000, far lower than the sum of the monies sent to Mingfu and Sun. *Id.* ¶ 30. Furthermore, the parties agree that none of these transfers were explicitly disclosed to CNEP's shareholders, either in the Form 8–Ks, the press releases accompanying those statements, or in any other periodic SEC disclosures. *See* Tr. of Oral Arg. at 8:21–9:1, Mar. 12, 2014 (Chao's counsel's concession that none of CNEP's SEC filings explicitly reference the transfers to Sun and Mingfu).

The SEC further alleges that these related-party transactions were not isolated incidents. At the behest of the Company's Audit Committee, CNEP retained a Hong Kong-based accounting firm to review all related-party transactions that took place in 2009. In July 2010, the accounting firm released a report identifying at least 176 undisclosed, related-party transactions between CNEP and Wang or Ju in 2009 alone. Cmplt. ¶¶ 35–36. The value of these transactions was approximately $59 million, and they included approximately $28 million of transactions directly or indirectly from CNEP's account to Wang or Ju. *Id.* ¶¶ 36, 39. This $28 million represents 43% of CNEP's reported annual revenue for 2009. *Id.* ¶ 41. Neither the volume nor the magnitude of these transactions was fully disclosed to the investing public, whether in the Company's offering documents, the associated press releases, or its periodic SEC filings. *Id.* ¶ 42, 50–51.

## II. Procedural Posture

Based on the aforementioned conduct, the SEC filed a seven-claim complaint against CNEP, Wang, Ju, and Chao on November 29, 2012. The first two counts allege that all defendants are liable for securities fraud violations of the Securities

Act and the Exchange Act based on their failure to disclose the foregoing related-party transactions in any of their SEC filings, as well as for raising funds from investors with the intent of diverting those funds to corporate insiders without a business justification. *Id.* ¶¶ 56–63. The next two counts claim that CNEP, Wang, and Ju are liable for books and records violations pursuant to the Exchange Act and a number of associated rules for their knowing falsification of the Company's accounting reports. *Id.* ¶¶ 64–72. The fifth and sixth counts charge the individual defendants with aiding and abetting CNEP's primary violations of the Exchange Act. *Id.* ¶¶ 73–78. And the seventh and final claim asserts that Wang and Ju, as control persons of the Company, are liable for its primary Exchange Act violations. *Id.* ¶¶ 79–82.[2]

Defendants responded to the civil complaint with three separate motions to dismiss—one on behalf of CNEP, a second on behalf of Wang and relief defendant Sun, and the third on behalf of Chao—all of which were filed on April 12, 2013. Ju did not file a motion to dismiss; in fact, she has not yet been served and has not appeared in this litigation. After the SEC's recent failed attempt to serve Ju in China, plaintiff filed a motion to serve her by alternative means on October 21, 2013.

## DISCUSSION

### I. Pleading Standards

#### A. Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009); *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007). Nevertheless, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citation omitted). Once the Court accepts all of the plaintiff's factual allegations as true, those allegations must demonstrate "more than a sheer possibility that a defendant has acted unlawfully" in order to pass muster under Rule 12(b)(6). *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). If a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955.

### B. Fraud Pleading

■ "It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168 (2d Cir.2000). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "This pleading constraint serves to provide a defen-

---

**2.** In addition, we note that the United States has brought criminal charges against defendants Wang and Chao for substantially similar conduct to what the SEC alleges in its civil complaint before this Court. On May 28, 2013, a grand jury in the District Court for the District of Columbia returned an indictment against those two defendants, charging both Wang and Chao with criminal securities fraud and conspiracy to commit securities fraud, and charging Chao with an additional two counts of criminal false statements for his allegedly untruthful testimony to the SEC about this matter. The trial for this case began on March 26, 2014.

dant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* While the SEC must meet the particularity standard under Rule 9(b), it need not satisfy the pleading requirements under the Private Securities Litigation Reform Act ("PSLRA"). *See S.E.C. v. Dunn*, 587 F.Supp.2d 486, 501 (S.D.N.Y.2008) ("Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language."); *see also* 15 U.S.C. § 78u–4(a)(1) (2012).

## II. Counts One and Two: Securities Fraud

### A. Legal Standard

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b) (2012). "Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *In re Openwave Sys. Sec. Litig.*, 528 F.Supp.2d 236, 249 (S.D.N.Y.2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Rule 10b–5 implements section 10(b) by making it unlawful:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2013).

Similarly, Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities:

(1) To employ any device, scheme, or artifice to defraud; or

(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (2012).

"In order to establish primary liability under § 10(b) and Rule 10b–5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996); *see also S.E.C. v. Mattera*, No. 11 Civ. 8323(PKC), 2013 WL 6485949, at *8 (S.D.N.Y. Dec. 9, 2013). "The elements of a claim under § 17(a) of the Securities Act, and under § 10(b) of the Exchange Act and SEC Rule 10b–5 are '[e]ssentially the same.'" *S.E.C. v. Constantin*, 939 F.Supp.2d 288, 302 (S.D.N.Y.2013) (quoting *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999)). The only meaningful analytical

distinction in this context is that the SEC need not plead scienter for a claim under subsections (2) and (3) of § 17(a). *See Aaron v. S.E.C.*, 446 U.S. 680, 695–96, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir.2013).

### B. Analysis

The parties do not dispute that the statements at issue were made "in connection with the purchase or sale of a security," but defendants assert that the SEC inadequately pled (1) that defendants acted with the requisite scienter and (2) that the statements at issue were material misrepresentations at all. In addition, defendants contend that, even if plaintiff has adequately pled liability based on misstatements or omissions, the SEC has not sufficiently pled "scheme liability" under Rule 10b–5(a) and (c).[3] For the reasons discussed below, we find these arguments unavailing.

#### 1. *Scienter*

■ "The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "[I]n order to state a claim for securities fraud, plaintiffs ha[ve] to allege facts giving rise to 'a strong inference of fraudulent intent.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir.1995)). A "strong inference of fraudulent intent" may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir.2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)) (internal quotation marks omitted); *see also S.E.C. v. Syron*, 934 F.Supp.2d 609, 631 (S.D.N.Y.2013).[4]

■ To raise a strong inference of scienter under the motive and opportunity prong, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307–08) (internal quotation marks omitted). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.; see also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001) (finding it insufficient for plaintiff to allege merely the existence of motives "that are generally possessed by most corporate directors and officers").

---

3. Subsections (a) and (c) of Rule 10b–5 are nearly identical to subsections (1) and (3) of Section 17(a). Defendants challenge the adequacy of the scheme liability pleadings under each of these sections, but throughout this Memorandum and Order, we will simply refer to Rule 10b–5.

4. The Second Circuit's "strong inference" requirement in pleading scienter predates the passage of the PSLRA, which also includes the "strong inference" language. *See* 15 U.S.C. § 78u–4(b)(2). "There is nothing to suggest, however, that the 'strong inference' standard as used in the PSLRA governs actions brought by the Commission." *S.E.C. v. Czarnik*, No. 10 Civ. 745(PKC), 2010 WL 4860678, at *6 n. 4 (S.D.N.Y. Nov. 29, 2010). As a result, we use the Second Circuit's historic two-prong test in deciding defendants' motions.

"Absent allegations of improper motive, the SEC may still plead sufficient circumstantial evidence of conscious misbehavior or recklessness to raise the requisite inference of scienter, but 'the strength of the circumstantial allegations must be correspondingly greater.'" *S.E.C. v. Egan*, No. 13 Civ. 236 WHP, 994 F.Supp.2d 558, 565, 2014 WL 345215, at *4 (S.D.N.Y. Jan. 31, 2014) (quoting *Kalnit*, 264 F.3d at 142). "Recklessness sufficient to establish scienter involves conduct that is 'highly unreasonable and . . . represents an extreme departure from the standards of ordinary care.'" *S.E.C. v. Mudd*, 885 F.Supp.2d 654, 661 (S.D.N.Y.2012) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996)).

In each of their motions to dismiss, Wang and Chao assert that the SEC has not adequately pled a strong inference of scienter under either prong. First, Wang claims that "[t]he only allegations of [his] motive apparent from the Complaint are that he desired to act in the best interests of CNEP." Def. Wang Hongjun & Relief Def. Sun Jishuang's Mem. Supp. Joint Mot. to Dismiss ("Wang Mem.") at 11. But this argument is wholly without merit. As a threshold matter, while related-party transactions are not per se unlawful, we view them with "extreme skepticism," especially when they go undisclosed. *McCurdy v. S.E.C.*, 396 F.3d 1258, 1261 (D.C.Cir.2005). But even absent this presumption, based purely on the facts alleged in the Complaint, Wang had a clear, twofold motive for filing substantially misleading documents with the SEC: (1) to funnel offering proceeds into his own account and that of his relatives, and (2) to conceal this conduct from the investing public and the government. When a plaintiff pleads that a defendant raised shareholder money using misleading documents and then partook in a series of undisclosed related-party transactions, "the inference that [the defendant] did so with fraudulent intent is not merely strong, it is inescapable." *In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279(CM), 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012). And as the single most influential figure in the Company and the signatory on the relevant SEC documents, Wang surely had the opportunity to engage in the fraud alleged. Therefore, we find that the SEC has satisfactorily pled scienter as to Wang.

Chao also asserts that his scienter was pled insufficiently. However, he couches his argument in the notion that the SEC "fails to specify what, if any, concrete benefit [Chao] received from *his father's* alleged receipt of money." Def. Jiang Chao's Mem. Supp. Mot. to Dismiss ("Chao Mem.") at 12 (emphasis in original). Such a formalistic interpretation of the "concrete and personal benefit" standard is completely untenable. To endorse this approach would allow any defendant to avoid consequences—at the pleadings stage, no less—by simply transferring proceeds into family members' accounts rather than into his own. *Cf. S.E.C. v. Cavanagh*, 155 F.3d 129, 137 (2d Cir.1998) (recognizing that a defendant should not be able to evade penalty "by the simple procedure of giving [property] to friends and relatives"). Even the least clever fraudster could escape liability under Chao's proposed interpretation of our securities laws. Therefore, we find that when, as here, the SEC pleads that a corporate insider's family member is the recipient of shareholder funds, this constitutes a sufficiently concrete and personal benefit to infer motive. *See Marcus v. Frome*, 329 F.Supp.2d 464, 473 (S.D.N.Y. 2004) (discussing a family's alleged receipt of stock as a concrete and personal benefit for scienter purposes). In addition, as the person with signature authority over the

CNEP Account and someone who contributed to the drafting of the offering statements, Chao had ample opportunity to commit fraud. *See* Cmplt. ¶ 21. Thus, as was the case with Wang, we find that the SEC has competently pled scienter as to Chao.[5]

■ Once we establish that plaintiff has pled scienter as to the individual defendants, it is clear that the SEC has done so with regard to CNEP as well. The Company asserts that a "compelling inference of *non* fraudulent intent is drawn from the Board of Directors' lack of knowledge of the transactions complained of" by the SEC. Mem. Supp. Mot. of CNEP to Dismiss ("CNEP Mem.") at 11. We recognize that the Complaint states that the Board of Directors "was not apprised of and did not approve" the transfer of funds to corporate insiders. Cmplt. ¶ 6; *see also id.* ¶¶ 29, 42. But if this were the end of the inquiry, it would eviscerate securities fraud as we know it. In reality, it is beyond cavil that the Board need not be aware of misconduct for a company to be liable. Corporate scienter is derivative of that of its individual agents; there is no requirement that those agents must be members of the Board of Directors. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.2008). As we have previously discussed, the SEC has adequately pled scienter with regard to both Wang and Chao. Putting aside Chao and whether he may properly be considered an agent of the Company, Wang, as the CEO, President, and largest individual shareholder, is clearly an officer whose intent could be imputed to the corporation. *See, e.g., id.* at 195; *In re Moody's Corp. Sec. Litig.*,

599 F.Supp.2d 493, 516 (S.D.N.Y.2009) ("As CEO of the Company, his scienter is imputed to [the corporation].").  Thus, plaintiff has also satisfactorily pled scienter as to CNEP.

### 2. *Material Misstatements or Omissions*

Defendants also maintain that the SEC failed to plead that the failure to disclose the related-party transactions at issue actually constitutes a material misstatement or omission. First, defendants contend that the "Complaint does not offer any sufficient explanation of why the related-party transactions should be considered material." Wang Mem. at 15. Second, defendants assert that the offering statements were not misleading at all, as the Company actually spent the proceeds as advertised. *See* CNEP Mem. at 10 ("[T]he record is rife with specific contrary facts that show the Company *did* spend not only what it promised to spend, but actually more, on the expressly stated purposes."); Chao Mem. at 9 ("[The] broad and open ended commitment regarding the use of funds is not misleading, as investors are aware that such proceeds may be used to fund a variety of business expenses and that the company has flexibility in committing funds."). For the reasons discussed below, we find these contentions to be without merit.

■ A statement is material for § 10(b) purposes if a substantial likelihood exists that a reasonable investor would consider the information important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d

---

**5.** As discussed above, scienter can be pled through *either* motive and opportunity *or* conscious misbehavior or recklessness. Because we find that the SEC has pled motive and opportunity, we decline to address the question of defendants' conscious misbehavior or recklessness.

Cir.2013). The issue of materiality "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir.2010). In fact, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (alteration in original) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)) (internal quotation marks omitted); *see also ECA*, 553 F.3d at 197.

Here, it is hard to imagine that the allegations in the Complaint would not be important to a reasonable investor. Plaintiff has alleged 176 related-party transactions which together amounted to approximately $59 million of related-party activity. Cmplt. ¶ 3. Given the number of transactions and their value, the materiality of these exchanges is apparent. Moreover, even if these transactions were fewer and of lesser value, "[w]hat reasonable investor would not wish to know that the money raised by stock sales would ... be diverted to [corporate] officers?" *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir.1978). Therefore, the failure to disclose the related-party transactions reference in the Complaint was material.

Next, we address CNEP's contention that the offering documents were not misleading at all because the Company actually spent *more* than the amount raised via the public offerings on expanding its operations and repaying debt. CNEP Mem. at 10–11. But the fact that the Company continued to make legitimate expenditures at the same time that it was engaging in related-party activity does not absolve CNEP of the responsibility to include these related-party transactions in its SEC filings. There is no dispute that shortly after the first public offering, over $1 million was sent to the CEO's wife and to the Vice President of Corporate Finance's father. *See* Tr. of Oral Arg. at 7:16–8:14. Regardless of any other expenditures, legitimate or otherwise, the absence of the related-party information from CNEP's SEC filings necessitates the conclusion that those filings are misleading as a matter of law.

Defendant Chao disputes the notion that the related-party transactions were never disclosed. He asserts that the initial registration statement stated only that CNEP would use the proceeds "for general corporate purposes, which may include working capital," Cmplt. ¶ 20, which is sufficiently broad to encompass the related-party transfers at issue. *See* Chao Mem. at 9. However, Chao's suggested definition is so broad as to render the phrase "general corporate purposes" meaningless. Any common-sense understanding of "general corporate purposes" does not include funneling shareholder funds to company insiders and their family members, and the transfers are not otherwise referenced in the Company's SEC filings. By definition, this represents an omission under our securities laws, the materiality of which we have already established. Thus, we find that plaintiff has pled the existence of material misstatements or omissions under § 10(b), Rule 10b–5, § 17(a).

### 3. Scheme Liability

Defendants contend that, even if we were to find that the SEC sufficiently pled misstatement and omission liability under Rule 10b–5(b), plaintiff also improperly attempts to plead scheme liability under subsections (a) and (c). "[T]he three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure

that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney Transfer Agent Litig.*, 884 F.Supp.2d 152, 161 (S.D.N.Y.2012). "Scheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y.2011). However, "it is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b–5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 475 (S.D.N.Y.2005).

█ In this case, the core misconduct alleged by the SEC is that defendants raised money under false pretenses and then channeled the proceeds to corporate insiders. The misstatements and omissions previous discussed were essential both to the plan's commencement and its concealment, and we acknowledge that without the misstatements and omissions, the plan could not have succeeded. However, the SEC has competently pled the existence of a larger scheme, one that went beyond mere misrepresentations to investors, whereby defendants enriched themselves and their families at shareholders' expense. While the misstatements and omissions certainly furthered that scheme, they do not comprise the scheme in its entirety. Therefore, we find that the SEC has adequately pled the existence of a fraudulent scheme.

█ Finally, both Wang and Chao attempt to distance themselves from the alleged scheme, maintaining that they were not sufficiently involved in the insider transfers at issue to be held liable. *See* Wang Mem. at 17 ("[T]he Complaint fails to plead that Mr. Wang had any involvement in any of these allegedly improper transfers."); Chao Mem. at 10–11 ("Plaintiff attempts to bootstrap a scattershot of factual allegations asserted against *other* defendants onto its claim against [Chao].... [W]here, as here, the defendant's alleged role in the creation of fraudulent statements is purely ministerial, liability does not attach.").

First, Wang's assertion is easily dismissed. Plaintiff pled that $28 million of the alleged related-party transactions flowed from CNEP to Wang or Ju, which included cash loans of at least $3.8 million to Wang himself. *See* Cmplt. ¶¶ 39–40. Moreover, given that he was the CEO, largest shareholder, the signatory on both 8–K filings, and the individual who "exerted actual control over CNEP," it strains credulity to believe that Wang was not involved in the allegedly improper transfers of funds. *Id.* ¶ 15, 22–23.

█ Second, Chao's assertion distorts his own involvement in the scheme. The Complaint alleges that he conducted meetings and made presentations to raise money for the September offering after having assisted in drafting and reviewing the allegedly fraudulent registration statement. *Id.* ¶ 21–22. After the public offerings, Chao continued to act as the face of this scheme, serving as the contact person in both of the press releases that accompanied the Form 8–Ks. *Id.* ¶ 22–23. In addition to this outward-facing role, Chao also worked internally to effectuate the scheme—as a person with signature authority over the CNEP Account, he authorized the transfer of nearly $1 million to his very own father, an individual who held no position with CNEP. *Id.* ¶ 25–26. Thus, the SEC has pled that Chao did more than perform ministerial actions

while in the dark about the goals of the scheme; it has pled that he was an active, aware, and essential participant subject to scheme liability. *See S.E.C. v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 486 (S.D.N.Y.2007) (determining that a plaintiff must plead that a defendant did more than perform "purely administrative duties without knowledge of the purpose of the scheme," but rather that the defendant's contribution "took the form of actions or statements that were independently deceptive or fraudulent").

In sum, the SEC has more than adequately alleged violations of Exchange Act § 10(b), Rule 10b–5, and Securities Act § 17(a) on the basis of defendants' misstatements and omissions, and their participation in a fraudulent scheme. Defendants' respective requests to dismiss Counts One and Two of the Complaint are hereby denied.

### III. Counts Three and Four: Books and Records Liability

■ Section 13(b)(5) of the Exchange Act provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of any issuer required to file reports. 15 U.S.C. § 78m(b)(5) (2012). Rule 13b2–1 implements § 13(b)(5) by ensuring that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Ex-

change Act."[6] 17 C.F.R. § 240.13b2–1 (2013). Section 13(b)(5) requires plaintiffs to plead that an individual acted with knowledge in order to hold said person liable. *See S.E.C. v. Kelly*, 765 F.Supp.2d 301, 323 (S.D.N.Y.2011); *S.E.C. v. Stanard*, No. 06 Civ. 7736(GEL), 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009). Rule 13b2–1, however, does not impose a scienter requirement. *See S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998); *Stanard*, 2009 WL 196023, at *29.

■ Both Wang and Ju are charged with books and records violations, but only Wang has moved to dismiss these charges.[7] He asserts that this claim must fail for two reasons: first, because the Complaint fails to demonstrate that the related-party transactions were required to be disclosed and second, because the Complaint inadequately pleads that Wang knowingly violated the books and records laws. For the reasons set forth, we reject these arguments.

Disclosure of related-party transactions is governed by Statement of Financial Accounting Standards No. 57 ("FAS 57") and Item 404 of Regulation S–K ("Item 404"). FAS 57 requires "disclosures of material related-party transactions." Related Party Disclosures, FAS No. 57 ¶ 2 (Fin. Accounting Standards Bd. 1982). Item 404 requires disclosures of related-party transactions when "the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a)

---

6. Section 12(b)(2)(A) of the Exchange Act requires every registered issuer of securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A) (2012).

7. Count Three charges defendants Wang and Ju with books and records violations, and

CNEP is charged with similar violations in Count Four. However, because the Company moved to dismiss only Counts One and Two of the Complaint, we do not address the sufficiency of the SEC's pleading of Count Four in any detail. We simply note here that plaintiff's books and records claim against the Company under Count Four may proceed.

(2013). The parties do not dispute the fact that the transactions involved related parties and that the amount exceeded $120,000. Thus, the only remaining issue is whether these transactions are material. As discussed above, we have already found that these transactions were material in the § 10(b) and Rule 10b–5 context. "The Second Circuit has ... interpreted the standard for materiality for FAS 57 purposes as being the same as the standard for materiality for Section 10(b) and Rule 10b–5 purposes." *S.E.C. v. Escala Grp., Inc.*, No. 09 Civ. 2646(DLC), 2009 WL 2365548, at *9 n. 7 (S.D.N.Y. July 31, 2009); *see also ECA*, 553 F.3d at 202 n. 8. Thus, the related-party transactions at issue are material under FAS 57 and Item 404, and Wang's argument that he was not required to disclose them must fail.

■ With regard to Wang's claim that he lacked the requisite scienter, it is true that the SEC must allege "a knowing violation of the reporting requirement[s]" to state a claim. *Escala*, 2009 WL 2365548, at *14. However, the "securities laws do not require that a defendant know the precise accounting treatment that would have been applied before [he] can have the requisite scienter; the SEC need only demonstrate that [a defendant] knew of facts that contradicted the substance of the reported accounting." *S.E.C. v. Espuelas*, 767 F.Supp.2d 467, 476 (S.D.N.Y.2011) (alteration in original) (quoting *S.E.C. v. Lucent Tech. Inc.*, 610 F.Supp.2d 342, 362 (D.N.J.2009)) (internal quotation marks omitted). As the undisputed central figure of the Company and, according to the Complaint, the personal recipient of mil-

lions of dollars in offering proceeds, Wang would certainly have known that the CNEP accounting reports omitted essential details about the allocation of corporate funds; his lack of accounting training or expertise is no bar to liability. *See S.E.C. v. Espuelas*, 698 F.Supp.2d 415, 432 (S.D.N.Y.2010) (noting that a defendant need not "have accounting knowledge or accounting expertise to have actual knowledge of an accounting violation"). Therefore, we find that the SEC has adequately pled Wang's books and records liability, and Counts Three and Four may proceed.

## IV. Counts Five and Six: Aiding and Abetting Liability

■ Section 20(e) of the Exchange Act addresses aiding-and-abetting liability: "[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."[8] 15 U.S.C. § 78t(e) (2012). In order to state a claim of aiding-and-abetting liability, the SEC must plead: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *S.E.C. v. Apuzzo*, 689 F.3d 204, 211 (2d Cir.2012) (citing *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir.2009)).

---

**8.** Although the current language of Section 20(e) includes the words "or recklessly" after "knowingly," those words were added by the Dodd–Frank Act in July of 2010. Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. § 78t(e)).

Because the events in the Complaint occurred before this date, the amendment does not apply. *See S.E.C. v. Apuzzo*, 689 F.3d 204, 211 n. 6 (2d Cir.2012); *S.E.C. v. Alternative Green Techs., Inc.*, No. 11 Civ. 9056(SAS), 2012 WL 4763094, at *3 n. 48 (S.D.N.Y. Sept. 24, 2012).

The SEC pleads two counts of aiding-and-abetting liability against each of the individual defendants: Count Five alleges that they aided and abetted CNEP's books and records violations, and Count Six alleges that they aided and abetted the Company's securities fraud violations. As discussed above, the SEC has met its burden in pleading primary liability against CNEP for both sets of violations, thus meeting the first prong of the aiding-and-abetting test. However, in their respective motions, Wang and Chao assert that plaintiff has not satisfactorily pled (1) their knowledge of the Company's misconduct or (2) that they substantially assisted the commission of CNEP's primary violations. As with their previous arguments, we find these assertions wholly unpersuasive.

First, on the question of scienter, we have already discussed Wang's knowledge in the context of his books and records violations. *See* Part III *supra.* For those same reasons, we also find that the SEC has competently pled his knowledge of the Company's books and records violations. With regard to the securities fraud violations, CNEP is liable on a primary basis because of the conduct of Wang, who was acting as CNEP's agent when he signed and filed the allegedly misleading documents. It would be nonsensical to find that Wang somehow lacks knowledge of conduct for which he himself was responsible. *See S.E.C. v. Subaye, Inc.,* No. 13 Civ. 3114(PKC), 2014 WL 448414, at *11 (S.D.N.Y. Feb. 4, 2014) (finding that when a corporate officer "drafted, signed, and certified" false and misleading SEC filings, that conduct supported claims of both primary and aiding-and-abetting liability against the officer).

■ We also find that the SEC has pled scienter as to Chao. The requisite scienter for liability under Section 20(e) is knowledge. *See Stanard,* 2009 WL

196023, at *30 ("Courts have been clear in requiring a showing of 'actual knowledge of the violation by the aider and abettor.'") (quoting *S.E.C. v. Cedric Kushner Promotions, Inc.,* 417 F.Supp.2d 326, 334 (S.D.N.Y.2006)). To meet this burden, a "defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability." *S.E.C. v. Espuelas,* 905 F.Supp.2d 507, 518 (S.D.N.Y.2012) (citations omitted) (internal quotation marks omitted).

■ Here, plaintiff pleads that Chao was involved in the scheme from start to finish: he first raised capital from investors, then controlled the money in the CNEP Account, and ultimately disbursed over $900,000 to his own father without explicitly disclosing these transfers to the public. Cmplt. ¶¶ 21, 25–26. As the VP of Corporate Finance and Secretary, Chao may have had "a title that … actually exceed[ed] his experience and responsibilities," but his conduct evinces his knowledge more clearly than a title ever could. Tr. of Oral Arg. at 13:16–17. Furthermore, any argument that Chao's position in the Company was less significant than it appears is not one that is properly considered in a motion to dismiss. Therefore, we conclude that the Complaint alleges facts sufficient to infer that Chao had "general awareness of [his] overall role" in the fraudulent scheme, thus satisfying the knowledge prong for aiding-and-abetting liability.

■ On the issue of substantial assistance, the adequacy of plaintiff's pleadings as to both Wang and Chao is plain. To demonstrate substantial assistance, "the SEC must show that the defendant in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it

succeed." *Apuzzo,* 689 F.3d at 207 (citations and alterations omitted). Based on the foregoing conduct, the SEC has pled that both Wang and Chao substantially assisted the Company in perpetrating books and records violations and securities fraud. Therefore, we find that the SEC has sufficiently alleged section 20(e) aider-and-abettor liability against the individual defendants as pled in Counts Five and Six of the Complaint.

## V. Count Seven: Control Person Liability

■ Section 20(a) of the Exchange Act confers liability on any individual "who, directly or indirectly, controls any person liable under any provision of this chapter ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a) (2012). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108; *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima,* No. 13 Civ. 842(SAS), 15 F.Supp.3d 336, 351, 2014 WL 661442, at *7 (S.D.N.Y. Feb. 20, 2014).

The SEC has asserted control person liability against only Wang and Ju, and only Wang has filed a motion to dismiss this count. He concedes that he was a control person of CNEP, but suggests that this count warrants dismissal because there was no primary violation. *See* Wang Mem. at 20. Having already found that plaintiff has amply and specifically pled that the Company violated multiple sections of the Exchange Act, Wang's argu-

ment must fail; control person liability has been pled.

## VI. Motion to Serve Ju by Alternative Means

### A. Previous Attempts at Service and Proposed Alternatives

Along with CNEP, Wang, and Chao, Ju is named as a defendant in the SEC Complaint filed on November 29, 2012. While all other defendants have been served and appeared before this Court, the SEC has not yet been able to effectuate service on Ju. Plaintiff first attempted to serve her at the house of Wang and Sun, her son and daughter-in-law. *See* Pl.'s Mem. Supp. Mot. to Serve Def. Ju Guizhi by Alternative Means ("Pl.'s Mem.") at 3. Once that attempt failed, the SEC mailed requests to waive formal service, pursuant to Federal Rule of Civil Procedure 4(d), to the following: (1) CNEP's counsel in this matter, who previously represented Ju in a separate lawsuit filed in this district; (2) CNEP's audit committee counsel; (3) CNEP's offices in New York and California; and (4) CNEP's registered agent for service of process. *Id.* The first two recipients acknowledged receipt of the waiver request but indicated that they were not authorized to waive service; the second two requests were returned as undeliverable. *Id.*

On March 11, 2013, the SEC attempted to serve Ju under the Hague Convention on the Service Abroad of Judicial and Extra–Judicial Documents in Civil and Commercial Matters (the "Hague Convention"). *Id.* at 4. Plaintiff sent the documents to be served on Ju to the Chinese Ministry of Justice and requested that they be delivered to an address that the SEC provided; this address was copied by plaintiff from a document that Ju filed with the SEC back on November 25, 2009. *Id.* On September 27, 2013, the SEC received a return from

China indicating that Ju could not be served because she did not reside at the address provided. *Id.*

At this point, the SEC maintains that it "is not aware of any other means of serving Ju under Chinese or international law," as China does not allow direct service of process via mail or hand delivery. *Id.* The SEC further asserts that despite its inability to serve Ju through the aforementioned methods, it has reason to believe she has actual notice of the lawsuit based on her alleged communication with Wang and Sun's former counsel in this matter. *Id.* at 3. Therefore, in its motion to serve Ju by alternative means, the SEC first requests a court order, pursuant to Federal Rule of Civil Procedure 4(f)(3), confirming that defendant Ju has already been adequately served. *Id.* at 7. In the event that the Court denies this request, the SEC proposes that we authorize service through either (1) delivering the requisite documents to the house of Ju's daughter-in-law in California, (2) serving CNEP's counsel in this matter, or (3) emailing the documents to her son. *See id.* at 7–8; Pl.'s Reply Supp. Mot. to Serve Def. Ju Guizhi by Alternative Means ("Pl.'s Reply") at 5.

**B. Analysis of the SEC's Proposals**

In evaluating plaintiff's motion, we must determine whether the SEC's previous attempts to serve Ju and proposed methods to serve her in the future comport with Federal Rule of Civil Procedure 4(f), which governs the service of individuals outside the United States. As relevant here, Rule 4(f) allows for service "(1) by any internationally agreed means of service that is reasonably calculated to give notice ... [and] (3) by other means not prohibited by international agreement, as the court orders." Fed.R.Civ.P. 4(f). Since both the United States and China are signatories to the Hague Convention, subsection (1) applies. However, because the SEC was unable to effectuate service on Ju using Hague Convention protocol, the focus of our inquiry is subsection (3).

First, the SEC's previous efforts do not constitute adequate service under Rule 4(f). Plaintiff concedes that its previous attempts to serve Ju or get her to waive service were unsuccessful, but it suggests that Rule 4(f) has been satisfied because these attempts resulted in her actual knowledge of this lawsuit. Pl.'s Mem. at 3, 7. However, a defendant's "actual knowledge is no substitute for service." *S.E.C. v. Anticevic,* No. 05 CV 6991(KMW), 2009 WL 361739, at *4 (S.D.N.Y. Feb. 13, 2009); *see also Arista Records LLC v. Media Servs. LLC,* No. 06 Civ. 15319(NRB), 2008 WL 563470 (S.D.N.Y. Feb. 25, 2008)(recognizing "persuasive authority for requiring service anew, even if a defendant has notice of the pendency of the action"). Thus, even if Ju has actual knowledge of this litigation, this awareness does not abrogate the requirement of proper service under the Federal Rules. We therefore deny plaintiff's request that we issue an order acknowledging that Ju has already been served by alternative means.

Finding the SEC's previous efforts to serve Ju insufficient, we now turn to their proposed alternative methods of service, namely delivering the documents to either Ju's daughter-in-law or to CNEP's current counsel. The court enjoys broad discretion in fashioning alternative methods of service under Rule 4(f)(3). *See RSM Prod. Corp. v. Fridman,* No. 06 Civ. 11512(DLC), 2007 WL 1515068, at *1 (S.D.N.Y. May 24, 2007) ("The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court.") (citation and internal quotation marks omitted).

"Although not explicitly provided for in the Rule, district courts in this Circuit generally impose two additional threshold requirements before authorizing service under Rule 4(f)(3): (1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Devi v. Rajapaska*, No. 11 Civ. 6634(NRB), 2012 WL 309605, at *1 (S.D.N.Y. Jan. 31, 2012). These requirements are imposed in order to prevent parties from "whimsically seeking an alternate means of service." *In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 266 (S.D.N.Y.2012) (citations and internal quotation marks omitted).

In cases such as this one, where service is first attempted pursuant to an international agreement, "there will undoubtedly be many instances where *significant efforts* to make service under the Hague Convention should be required by a court before alternative service is ordered." *Id.* (emphasis added). When courts have allowed for alternative service, they have done so when "plaintiffs have been unable, despite *diligent efforts*, to serve the defendant in the [foreign country] according to the Hague [ ] Convention procedures." *S.E.C. v. Shehyn*, No. 04 Civ.2003(LAP), 2008 WL 6150322, at *3 (S.D.N.Y. Nov. 26, 2008) (alteration in original) (emphasis added); *see also Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y.2010) ("A district court may require the parties 'to show that they have reasonably attempted to effectuate service on the defendant(s) and that the circumstances are such that the district court's intervention is necessary.'") (quoting *Export–Import Bank v. Asia Pulp & Paper Co., Ltd.*, No. 03 Civ. 8554(LTS)(JCF), 2005 WL 1123755, at *4 (S.D.N.Y. May 11, 2005)).

■ Here, there is no evidence that the SEC undertook such diligent efforts. It made one attempt to serve Ju pursuant to the Hague Convention, and did so using an address that was more than three years old at the time. There is no indication that the SEC ever contacted the two subsidiaries for which Ju acted as General Manager through February 15, 2012; no indication that it engaged the Chinese authorities after the first attempt at service under the Hague Convention could not be completed; and no indication that the SEC conducted a meaningful investigation to ascertain Ju's whereabouts. Plaintiff's request that we authorize alternative service ultimately "strikes this Court as a measure of convenience rather than necessity." *In re Sinohub, Inc. Sec. Litig.*, No. 12 Civ. 8478(WHP), 2013 WL 4734902, at *2 (S.D.N.Y. Aug. 14, 2013).

Moreover, even if this Court were convinced that the SEC had been assiduous in its attempts to effectuate service on Ju, we would still be unwilling to authorize the alternative methods of service it proposes. "Service pursuant to Rule 4(f)(3) must comply with constitutional notions of due process and constitute 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Shehyn*, 2008 WL 6150322, at *3 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

■ With regard to the first proposal—service on Ju's daughter-in-law—there is no reason to believe that those two are in communication at all. Absent some substantive evidence that Ju and Sun are in contact with one another, this Court will not endorse the notion that documents delivered to a home in California are "reasonably calculated" to reach an unknown

destination in China, particularly when Sun has every incentive not to pass the documents along to her mother-in-law. As a result, we reject this proposal.

Second, while courts have authorized service under Rule 4(f)(3) to an unserved party's counsel, such a method is only appropriate when there is "adequate communication between the individual and the attorney." *In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. at 267. This communication requirement remains essential when a party looks to serve an individual through his corporate rather than his personal attorney. *See In re Sinohub*, 2013 WL 4734902, at *3 ("Where a defendant's level of communication with [its corporate] counsel is too attenuated, service through counsel does not comport with due process."); *Madu, Edozie & Madu*, 265 F.R.D. at 116–17 (finding that the absence of communication between corporate counsel and individual defendants rendered service on those defendants through said counsel inadequate). In this case, there has been no showing that CNEP's counsel is in touch with Ju, and CNEP's counsel has represented, to the Court that he would be unable to deliver the service documents to her. *See* Decl. of Michael J. Coffino in Supp. of Mem. of Law in Opp'n to Pl.'s Mot. to Serve Def. Ju Guizhi by Alternative Means ¶ 6. Based on the lack of evidence suggesting any recent communication between Ju and CNEP's counsel, this proposed method of service is inadequate.

Finally, the SEC maintains in its reply that we should allow it to serve Ju by sending the requisite documents to her son's email account. Pl.'s Reply at 5. "Service by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant." *F.T.C. v. Pecon Software Ltd.*, 2013 WL 4016272, at *5 (S.D.N.Y. Aug. 7, 2013).

But if "the SEC presents no evidence that e-mails to [the proposed] addresses today are likely to reach Defendants," then plaintiff's motion for alternative service via email should be denied. *S.E.C. v. China Intelligent Lighting and Elecs., Inc.*, No. 13 Civ. 5079(JMF), 2014 WL 338817, at *1 (S.D.N.Y. Jan. 30, 2014). Thus, while email may be an acceptable alternative method of service, it would only be permissible in this case if the SEC provides evidence that an email to Ju's son would likely be relayed to Ju herself, a conclusion which would be counterintuitive given the lack of incentive for Wang to ensure service on his own mother.

The only argument that the SEC offers for why an email to Wang is an appropriate method of service is that CNEP's counsel recently attempted to serve Ju by this very approach in another action. However, there is nothing to suggest that service in this manner actually succeeded or that Ju responded to that motion in such a way as to demonstrate receipt of process. The bare assertion that this method has been tried in another context does not mean that it is valid for our purposes. Considering the lack of additional evidence, the SEC has failed to establish that an email to Wang is likely to reach Ju.

Therefore, we decline to authorize alternative service on Ju through the methods proposed by the SEC. Its previous attempts at service have been insufficiently diligent, and even if we were satisfied with plaintiff's efforts, the alternative methods it proposes are not "reasonably calculated" to apprise Ju of this lawsuit. Thus, they do not pass constitutional muster, and the SEC's motion is denied.

## CONCLUSION

For the foregoing reasons, we deny the respective motions to dismiss filed by

CNEP, Wang and Sun, and Chao. We also deny the SEC's motion to serve Ju by alternative means. The Clerk of the Court is hereby respectfully directed to terminate the motions pending at docket numbers 25, 28, 31, and 57.

**SO ORDERED.**